## GUINN v. IMPERIAL SUGAR CO., Inc.
### No. 9546.

Court of Civil Appeals of Texas. Galveston.

July 9, 1931.

Rehearing Denied Dec. 3, 1931.

Henderson & Copeland, C. H. Chernosky, and A. B. Gerland, all of Houston, for appellant.

King, Wood & Morrow, of Houston, for appellee.

LANE, J.

This suit was brought by John H. Guinn against Imperial Sugar Company, a corpora-

tion, to recover the sum of $35,000 for personal injuries alleged to have been sustained by him on or about the first day of September, 1927.

Plaintiff alleged that his injuries were caused by the negligence of the Imperial Sugar Company, hereinafter for convenience called the sugar company, acting by and through its servants, agents, and employees acting within the scope and course of their employment on behalf of the sugar company. He alleged that he was permanently injured by being struck by a heavy iron vise attached to a bench protruding from an automobile truck then and there being driven by an agent, servant, or employee of the sugar company at its direction; that the defendant was guilty of negligence in a number of particulars; and that such acts of negligence were the proximate cause of all of the injuries of which he, plaintiff, complains.

The sugar company answered by general demurrer, general denial, and by an allegation of contributory negligence on the part of the plaintiff.

The court overruled defendant's general demurrer. A jury was selected, impaneled, and sworn to try the cause, but the court after hearing the evidence of both parties, upon motion of defendant, instructed a verdict in its behalf. Such verdict was returned by the jury and judgment accordingly rendered, and from such judgment the plaintiff has appealed.

The undisputed evidence shows that one Carrol Scarborough was, at the time the plaintiff sustained his injuries, driving the truck upon which the vise which struck and injured the plaintiff was placed, and that the plaintiff received the injuries complained of as a result of such striking.

It seems to be agreed on this appeal by both parties that the theory upon which the trial court instructed a verdict for the sugar company was upon a conclusion that there was no evidence to raise the issue as to whether or not Carrol Scarborough, the driver of the truck in question, was a servant, agent, or an employee of the sugar company at the time of the accident, or to raise the issue as to whether or not he was at such time under the special control of appellee, the sugar company, and upon the further conclusion that there was no evidence to raise the issue as to whether or not appellee and the Sugarland Industries were so jointly interested in the work being performed by the driver of the truck as to constitute appellee a joint tort-feasor at the time appellant sustained his injuries, and that there was no evidence to raise the issue as to whether or not there was such an acting together of appellee with the Sugarland Industries in the particular errand on which said driver of the truck was engaged at the time appellant sustained his injuries as to make appellee liable as a tort-feasor for such injuries.

Appellant insists that the court erred in all of such conclusions, and in instructing a verdict for appellee thereupon, in that there was ample evidence to raise an issue upon each and all of such issues.

The majority of this court thinks that appellant's contentions should be sustained.

Appellant testified that the truck being driven by Scarborough at the time of his injury was used by appellee; that as an employee of appellee sugar company he had driven the truck in hauling stuff around, getting what appellee had to have to work with; that appellee has a garage and repair shop which has on it a sign "Imperial Sugar Company"; that the automobile which struck him was kept in a shed adjoining the garage, all under one roof; that he used such truck in doing his work for appellee; that his work was being done for appellee in furtherance of its business; that at the time he was injured by the truck it was on its way to put gas in a house in which one Kelley, an employee of appellee, lived.

Cook Butler testified: That Scarborough worked in the sugar refinery; that his headquarters was at the refinery; and that when he was sent out to work he was sent from the refinery by Mr. Inquist, who was his boss and whose headquarters was also in the refinery, that is, in a small building just back of the refinery; that all he knew was that Mr. Inquist worked for the sugar company; that he had charge there of the pipe fittings in the refinery, and of all the pipe fittings down anywhere in Sugarland; that the name "Imperial Sugar Company" is on the bank building, the garage, and the machine shop; that the words on the bank building are "Imperial Sugar Company General Office"; on the garage, "Imperial Sugar Company Machine Shop and Garage."

Carrol Scarborough testified that on September 1, 1927, the date when appellant was injured, he was employed in pipe line fitting at Sugarland; that he was driving the truck which struck appellant; that Mr. Inquist, his foreman, sent him out to put some gas openings in a house on Imperial boulevard, and that on the way to the house the accident occurred.

It is shown that on the 10th day of May, 1921, Isaac Kempner, Daniel Kempner, William Eldridge, Jr., and Gustav Ulrich associated themselves together under the name of the Sugarland Industries, unincorporated; such association was formed under a certain declaration of trust dated January 1, 1919, in which it is declared that said parties as trustees of the Sugarland Industries were conducting business under the name of Imperial Bank & Trust Company, Imperial Mercantile Company, Imperial Sugar Company, Imperial

Mattress Company, and Sugarland Manufacturing Company.

Gus Ulrich, vice president and general manager of the several industries at Sugarland, including the Imperial Sugar Company, a corporation, shows by his testimony that the sugar company was incorporated in 1924, and, after such incorporation, the Sugarland Industries operated it under a lease contract until January 1, 1927, from which time the sugar company has operated the sugar business itself; that the two companies were separate and distinct companies, formed by the same parties, however. Being formed by the same parties, they entered into an agreement whereby for convenience and economy the Sugarland Industries became an employment agency for both companies.

Mr. Ulrich testified:

"If the Imperial Sugar Company needed anybody to work there for them, they made application, whoever wanted the help, the Sugar Company's foreman, or whoever wanted the man, would make application to the labor department and Foreman in charge of the Industries, or through the Timekeeping Department of the Industries for such a man or men as they might want in the various departments, when they needed them. When The Sugarland Industries had a requisition for men or request for men, the men would be furnished by them to the Imperial Sugar Company for that particular job for the period they were needed; in other words, the Sugarland Industries furnished the man or men to the Imperial Sugar Company. Now, when those men quit working for the Sugarland Industries and went over to the refinery or went over to work for the Imperial Sugar Company on that requisition for workmen, a record would be kept by the Sugarland Industries of the time that they worked for the Sugar Company, and the Sugar Company would be charged with that time by the Sugarland Industries. In other words, if we were paying a man four dollars a day, and the Imperial Sugar Company called on the Industries for ten laborers drawing four dollars a day, when they went over there we would check their time that they put in there to the Imperial Sugar Company; then when they ceased work for the Imperial Sugar Company, we would put them to work for some other company, if they were needed; they would report back to the Sugarland Industries, when they ceased work for the Imperial Sugar Company. We would have an absolute record of the time that they had been over at the Imperial Sugar Company. Now then, on the 15th of the month, when it came time for that man to get his money, the Sugarland Industries would pay him; and then the Sugarland Industries would render a bill to the Imperial Sugar Company, and they in turn would pay the Sugarland Industries for whatever time such a man had put in for

them; that was the practice in effect at Sugarland on the 1st of September, 1927."

"The reason for that procedure was for our convenience, and the economical feature of it also. * * * That arrangement has been very satisfactory to the Imperial Sugar Company, and quite a saving to them. * * * This arrangement that I spoke of whereby the Sugarland Industries is sort of an employment agency is done for convenience of the various companies there at Sugarland, and for the economical feature; that was done for the convenience of the Imperial Sugar Company as well as everybody else.

"We have men over there at the Imperial Sugar Company's refinery, grinding out sugar, and they are paid direct by the Sugarland Industries so much money, but then it is later paid back to the Sugarland Industries by the Imperial Sugar Company.

"Say the man in question was getting twenty-five dollars a month, that twenty-five dollars would be paid to him on pay day by the Sugarland Industries; and that very same sum of twenty-five dollars would be paid by the Imperial Sugar Company to the Sugarland Industries, whenever the Industries billed the Sugar Company for it.

"There is an allocation made of the expense of operating the General Office; the expenses are split in accordance with—as it is felt is proper by reason of the number of people in it that might be engaged in work for the different departments; and having the men all doing different work in the offices, we allocate the expenses of the offices in the proportion, in our opinion, from the amount of work done and space occupied by the employees of the various companies in the offices; the portion allocated to the Imperial Sugar Company would be governed by the amount of work done by the office employees for that company and the space occupied by those employees in the office building.

"When a man works in the sugar refinery, grinding sugar for the Imperial Sugar Company, the benefit of his work goes to the Imperial Sugar Company, exclusively, as long as he is there, doing that work.

"This office where I conduct all of those transactions has got the name 'Imperial Sugar Company' on it; and that office is presided over by me; and I am Vice President and General Manager of the Imperial Sugar Company, and under me is this Mr. Inquist. * * * His place of business happens to be located on the sixteen acres of land that belongs to the Imperial Sugar Company."

Testifying further, he said:

"Mr. Scarborough had a locker, but all the employees had them. Lockers for all the employees who work for the Imperial Sugar Company are located on the property of the Imperial Sugar Company. * * * His locker was on the property of the Imperial Sugar

Company, and he reported there for work every morning, and when he went out on a job he was sent out by Mr. Inquest, and when he reported back, he reported back to Mr. Inquest on the property of the Imperial Sugar Company.

"In my opinion, the Imperial Sugar Company, as such, has some employees as distinguished from the employees of the Sugarland Industries. * * * It is a fact that the Imperial Sugar Company is a corporation, capitalized for five million dollars and doesn't have a single employee that they pay directly; we consider that an economical and convenient way of doing business. The Imperial Sugar Company has a refining plant and six or seven other buildings, all located on their property, or on the sixteen and a fraction acres; there is a sugar house, where they grind the cane; there is a boiler room; the pressing house, where they press the raw sugar and the char house where they refine the sugar, and a warehouse where they dump and weigh and ship the sugar from; and the garage building, which has the name 'Imperial Sugar Company' on it; that garage building is owned by the Imperial Sugar Company. That big water tank is on the property of the Imperial Sugar Company. * * *

"It is my opinion that they are employees of the Imperial Sugar Company when they are actually at work in the sugar refinery; and the mere fact that they may be paid by the Sugarland Industries don't take them out of that classification in my opinion, not while they are working on the properties of the Imperial Sugar Company."

Again:

"Now, referring to the other deed, dated December 23, 1924, from the Sugarland Industries, an association of Trustees, composed of I. H. Kempner and D. W. Kempner of Galveston County, Texas, and W. T. Eldridge, Jr., and G. D. Ulrich of Fort Bend County, Texas, transferring to the Imperial Sugar Company, a corporation, for and in consideration of $1.00, the following described properties: all of those certain wells, domestic underground lines; sprinkler system, underground lines; electric distribution, underground lines and pole lines located on and extending from the following described parcel of land, which is the same parcel of land conveyed by the Sugarland Industries to the Imperial Sugar Company, the 16 acres, mentioned in the deed just offered in evidence by the plaintiff; and the location of said lines are shown on the map attached thereto and made a part thereof. * * *

"The map shows the entire town of Sugarland at that time, and shows all the underground wire and piping system; that had theretofore been owned by us four men as the Sugarland Industries; but I state as my opinion that that deed doesn't transfer those underground lines. That fire department was used generally for all of the properties of the city. The Imperial Sugar Company supplies the water for all of those houses at Sugarland; they get paid for it though; the Imperial Sugar Company owns the water lines and runs the water system at Sugarland."

Again: "When these men were working in the Imperial Sugar Company at any time, they were at that time under the control of the management of that company."

Again: "The Imperial Sugar Company was the owner of the repair shop and the machine shop there."

Testifying with reference to the ownership of the gas line, Ulrich said: "The commercial gas line is paid by the Sugar Company entirely; that's the gas that goes to the refinery; well, it does go also to a few of the smaller places, like down at the Machine Shop, which of course is a part of the refinery, and I believe it goes to the printing plant, but the Imperial Sugar Company pays for all of it; the Imperial Sugar Company pays the entire bill that comes from the Pipe Line Company each month."

Testifying as to how the general expenses incurred by the several corporations under the control of the four persons, I. H. Kempner, Daniel Kempner, William Eldridge, and Gus Ulrich, the witness said:

"Those corporations would be charged up by the Sugarland Industries with the time the men actually worked over there at the different places. The reason for that procedure was for our convenience, and the economical feature of it also. The Imperial Sugar Company does not work the same number of men all the time; if they had their own employees, whom they employed direct, whenever they shut down, they would have to lay them off; but the Sugarland Industries has, as I have stated, many different characters of business and places for men to work in different capacities and departments; and so not from convenience, but that is the economical way for us to handle it; that arrangement has been very satisfactory to the Imperial Sugar Company, and quite a saving to them; and it has likewise been satisfactory to the Sugarland Industries; we keep the men busy in that way, without having to lay them off. Our records would disclose the different days and the different places one of our employees worked, and for which company he worked each day. Our records will disclose what Carrol Scarborough was doing on this particular day, September 1, 1927; and will show for what company he was actually performing labor at that time; and that likewise would be true as to John Guinn. * * *

"On September 1, 1927, the General Offices in Sugarland were at the same place as they

are now, which is where the Bank is. There is an allocation made of the expense of operating the General Office; the expenses are split in accordance with—as it is felt is proper by reason of the number of people in it that might be engaged in work for the different departments; and having the men all doing different work in the offices, we allocate the expenses of the offices in the proportion, in our opinion, from the amount of work done and space occupied by the employees of the various companies in the offices; the portion allocated to the Imperial Sugar Company would be governed by the amount of work done by the office employees for that company and the space occupied by those employees in the office building, and the same as to the Sugarland Industries, etc. We find that a very economical way of handling the matter. that is in accordance with good business judgment in the operation of big businesses."

The same witness testifying further said: That when the employees were working for the sugar company they were at such time under the control of the manager of that company; that Mr. Inquist had been with the companies since 1924; that his work during the time he was employed had been partly in connection with the properties described in the deed of the Sugarland Industries, by which it conveyed certain properties to the sugar company; that such properties belonged to the sugar company; that he could not recall how much of the time Inquist worked for the sugar company as general manager of such company.

I. G. Wirtz, called by appellee sugar company, testified that, when a truck had been delivered to a foreman of the sugar company and gone out on a repair job, then the truck would be directly under the control of that man.

There is other testimony on the same subjects testified to by the witnesses named, some sustaining the contention of appellant, and others in conflict therewith, which tends to support the contention of appellee, but we deem it unnecessary to cite further testimony to sustain appellant's contention that the evidence clearly raised the issue as to whether or not Scarborough, the driver of the truck, was at the time of the accident an agent, servant, or employee of the sugar company, and under its control; and as to whether or not the sugar company and Imperial Industries were so jointly interested in the work being performed by Scarborough at the time of the accident as to constitute him the servant of both of such parties, who were acting together in the particular work then being performed, and that the court erred in disregarding such evidence and instructing a verdict for appellee.

Having reached the conclusion that the court erred in instructing a verdict for appellee, the majority of this court orders that the judgment of the trial court be reversed and the cause remanded; Chief Justice PLEASANTS dissenting.

Reversed and remanded.

PLEASANTS, C. J. (dissenting).

I cannot agree with my associates in the conclusion that there is any evidence in the record of this case tending to show that Carrol Scarborough, whose negligence is alleged in the petition to have been the cause of appellant's injuries, was at the time such injuries were inflicted an agent or employee of appellee engaged in work for appellee.

The undisputed evidence shows that Carrol Scarborough was hired and his wages paid by the Sugarland Industries, a trust organization, separate and distinct from the Imperial Sugar Company, a corporation organized under the laws of this state; and that at the time of the accident in which appellant was injured Scarborough was engaged in performing services for the trust organization in which the appellee corporation had no interest. He was driving a truck owned by the Sugarland Industries and on his way to repair a gas pipe in a house owned by said organization.

The Sugarland Industries, trust association, was organized on January 1, 1919, by I. H. Kempner, D. W. Kempner, W. T. Eldridge, Jr., and G. D. Ulrich. The purpose of the organization, as stated in the declaration of trust, was to engage in farming, manufacturing, buying, and selling goods, wares, and merchandise, at wholesale and retail; owning, developing, and subdividing lands, and buying, owning, and selling shares of stock in corporations and associations.

It owns and carries on its business through a number of agents and instrumentalities, corporate and unincorporated. The appellee was one of those instrumentalities. The mere fact that servants and employees of the trust organization were also servants of the appellee corporation could not make appellee responsible for the negligence of any such servant while he was engaged in performing the duties of his employment as servant of the trust organization, especially when the business in which the service was being performed was one in which the appellee had no interest, as is shown by the undisputed evidence in this case.

The petition upon which the case was tried alleged that appellee was engaged principally in the importation, manufacturing, and refining of sugar and its products, and owned extensive building, mills, and factories in which its said business was carried on under a trade-name, and it was "commonly known and designated as the Sugarland Industries of Sugarland, Texas"; and that appellee owned in connection therewith a number of rent houses in the town of Sugarland, which were

occupied by its employees. This petition further alleges: "That appellee was the owner of one certain automobile truck, bearing the 1927 license number, No. 362-702, and company number, No. 942; which was then and there being driven at the direction of said defendant, and for its use and benefit by its agents, servants and employees, while acting within the scope of their employment in that behalf"; and that this truck, when it struck and injured the plaintiff, was occupied by appellee's agents, servants, and employees, and was going to one of the houses owned by appellee for the purpose of connecting up certain gas fittings or pipes in said house.

There is no evidence to sustain these allegations, but on the contrary, as before stated, they were all disproven by the uncontradicted evidence, except the allegations that appellee's principal business was the manufacture and sale of sugar, as therein alleged.

Appellee was incorporated under the name of Imperial Sugar Company, and the buildings owned by it were those situated on a tract of about 16 acres of land, conveyed to it by the Sugarland Industries, trust association, which formed a part of its manufacturing and refining plant. The Sugarland Industries owned all the stock of the appellee corporation, and most if not all of the buildings and houses in the town of Sugarland, except those situated on the land conveyed by it to appellee; it also owned and transacted a business through the following agents and instrumentalities: The Sugarland Industries, the Sugarland Printing Company, the Sugarland Feed Company, Imperial Bank & Trust Company, Imperial Lumber Company, Imperial Mercantile Company, Imperial Drug Store, Imperial Creamery, Imperial Meat Market, Imperial Gin, and Texas Commercial News.

As before stated, both the truck which Scarborough was driving and which caused the injury to plaintiff, and the house and gas pipes which he, an employee of the Sugarland Industries, was going to repair, were shown by the undisputed evidence to be owned solely by the Sugarland Industries trust organization.

The evidence set out in the opinion of the majority showing that the truck which Scarborough was driving at the time appellant was struck and injured thereby had been frequently used by Scarborough as an employee of the appellee sugar company in the service of appellee, and was kept on the premises of the appellee, does not, in view of the undisputed evidence that Scarborough was employed and his wages paid by the Sugarland Industries association, and that the truck was owned by the Sugarland Industries, and that at the time appellant was injured thereby Scarborough was using and driving the truck in the service of his master and employer, the Sugarland Industries, on his way to repair property of the Sugarland Industries in which appellee had no interest, raise an issue as to the ownership of the truck, nor as to whose service Scarborough was engaged in at the time of the accident in which appellant was injured. The facts that Scarborough was often and probably generally engaged in the service of the appellee, and that the truck was kept on the property of appellee, has no probative force against the undisputed evidence showing the service in which Scarborough was engaged at the time of appellant's injury and the ownership of the truck.

Nor does the evidence set out in the opinion of the majority raise the issue against appellee of its being a joint tort-feasor with the Sugarland Industries in the injury of appellant.

It may be that this evidence would be sufficient to hold the Sugarland Industries responsible for an injury caused by one of the servants of the appellee while engaged in work for appellee, but I cannot see on what rule of law or reason the appellee can be held liable for an injury caused by one of these servants of both associations while engaged in work for the Sugarland Industries association in which the appellee had no interest.

It seems clear to me that the judgment of the trial court is correct, and should be affirmed.