GEHRING et al. v. GALVESTON ELECTRIC CO.

(Court of Civil Appeals of Texas. Jan. 17, 1911. On Motion for Rehearing, Feb. 9, 1911.)

1. STREET RAILROADS (§ 118*)—INJURIES TO TRAVELERS—DISCOVERED PERIL.

Decedent was run down by a street car approaching him from the rear as he was walking either on the track or between the two tracks of defendant street car company. There was evidence that, while the car was at least a block and a half distant, deceased's proximity to the track was such as to excite in the minds of witnesses an apprehension that he would be struck, and that it was apparent that he did not hear the gong. The car did not slacken speed, but ran at least two cars lengths after striking him. *Held*, that an instruction on discovered peril relieving defendant from liability unless the operatives of the car realized that deceased could not or would not save himself, but would "certainly" be injured unless they could prevent it, was erroneous, since, if it was apparent to the motorman that decedent was unconscious of danger, he was bound to take steps to prevent any injury.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 258–269; Dec. Dig. § 118.*]

2. NEGLIGENCE (§ 83*)—DISCOVERED PERIL—REQUISITES.

It is sufficient to justify a recovery for negligence on the ground of discovered peril if

the peril is discovered in such time that, by the proper use of the agencies at hand by defendant or its employés, the injury may be avoided.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 115; Dec. Dig. § 83.*]

Appeal from District Court, Galveston County; Robt. G. Street, Judge.

Action by Augusta Gehring and others against the Galveston Electric Company. Judgment for defendant, and plaintiffs appeal. Reversed and remanded.

Hogg, Gill & Jones and James B. & Charles J. Stubbs, for appellants. Terry, Cavin & Mills, for appellee.

McMEANS, J. The appellants Augusta Gehring and her daughter, Elsie Gehring, brought this suit against the Galveston Electric Company, a corporation, operating a street railway in the city of Galveston, to recover damages for the death of C. C. Gehring, the husband of Augusta, and the father of Elsie; it being alleged that his death was due to the negligence of the operatives of a street car of appellee, as a result of which the car collided with C. C. Gehring and killed him. The grounds of negligence averred, first, a failure to keep a reasonable lookout and sound warnings on the approach of the car; and, second, that the motorman discovered deceased and his peril in ample time to have stopped the car, or so reduced its speed, by the use of the means at hand, as to have prevented the injury. The defenses urged were, in substance, a general denial and contributory negligence. There was a verdict and judgment for defendant, and from an order overruling a motion for new trial the plaintiffs have appealed.

It appears to be conceded that the accident happened on Market street, which runs east and west, at a point between the intersections of this street and Thirty-Second and Thirty-Third streets, which run north and south, and that there were two street car tracks, in Market street, the north one being used exclusively by west-bound cars and the south one by east-bound cars, and that the car that collided with deceased was a west-bound car.

The evidence in the record tending to raise the issue of discovered peril is substantially as follows:

F. Hamilton testified: "While the car was standing there (at the fire engine house at the corner of Twenty-Ninth and Market, more than two blocks from the place where the accident happened), I was sitting on the left-hand side of the car, about three windows from the front end, and was looking out of the window, and saw the old gentleman (deceased) walking in the direction the car was going on Market street about a block and a half from the car, down between the curbing and the first car track.

Soon after the car started, he stepped over between the two car tracks, and continued to walk as before. The car was started at full speed in order to make up the time they had lost in the firehouse, and when the car passed Thirty-First street, without making any check in speed, or giving any warning of any kind, I saw it was going to strike the old man who was walking between the tracks, and, when it was 25 or 30 feet from him, I hollowed at him, but it was too late for him to get out of the way. The car was going so very fast, and in an instant the car struck him and knocked him over on the left-hand side of the track, being the same side I was sitting on in the car. When the car struck the man, it was about a quarter of a block between Thirty-Second and Thirty-Third streets. After he (deceased) had walked about a quarter of the way between Thirty-First and Thirty-Second streets, he stepped over between the two car tracks, and continued walking that way until the car struck him. He was walking right in between the two car tracks, and the space between the tracks is about four feet. The car was still standing at the firehouse when I first saw the man, and, when the car started, he was still walking between the sidewalk and the first track, and, after the car had gone a short distance, he stepped over between the two car tracks. and, as I have stated, continued to walk westward until the car struck him. He was about a block and a half from the car when I first saw him, and he was in plain view all the time until the car struck him and passed him. He did not turn his head, or do anything to indicate that he was conscious of the approach of the car. No attempt was made by either the motorman or the conductor to stop the car or check the speed until after the accident. From the time the car started from the firehouse, it went at full speed, and it did not slow up or check its speed until after the accident, and there was no effort made to stop the car or check its speed until after the accident. He (deceased) was about a block from the car when he stepped over between the two tracks."

William Gauslin testified: "I was present when the car hit Charles C. Gehring which caused his death. I was present when the accident took place. I was sitting in a street car when said accident happened. I saw Charles C. Gehring just prior to, and got to him immediately after, the accident. The car lost several minutes there (at the firehouse), and on starting it continued west at an unusual speed, and on Market, near Thirty-Third street, it hit an old gentleman whom I did not recognize until the car was stopped and I got to him. Before the car was stopped, I stood up and asked the conductor if he was not going to stop the car,

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

134 S.W.—19

telling him that he had struck an old man and had seriously injured him. The car went about 150 feet after it struck Gehring. I got up and told the conductor to stop the car; that he had struck an old gentleman. He did so, and I got out of the street car and went to the old gentleman. I told the conductor to stop the car that he had hit an old gentleman. He immediately stopped the car when I told him. It never stopped from the time it left Thirtieth and Market street until it hit the old gentleman. It kept the same speed all the way, which was very fast. Immediately before the accident, the deceased was walking west. He was walking west with his back towards the car. I did not see the deceased immediately when the car struck him. I saw him afterwards."

The witness, A. Bellar, testified: "I saw the man who was injured just before the accident occurred. The motorman was sounding his gong, and that attracted my attention to the man who was injured, who I learned after was Charles C. Gehring. When I first saw him, he was about 25 or 30 feet from the car. When the car was about 10 feet from him, he suddenly turned sideways, and just as the car was passing him he was against its side. I judge he struck the car just south of the iron gate." He further testified: "I did not at any time see that he was in danger of being injured before he was actually injured. He was in no danger at all, and could not have been hurt had he not turned into the side of the car."

· The witness Altenberger testified that the deceased when he first saw him was walking in the path between the two car tracks, going west and the car coming up behind him, and was within 10 feet of him; that the deceased must have turned half around, when the car struck him on the right shoulder and knocked him down; that after he fell the car ran about two car lengths, he judged, from where it struck him; that he did not think the motorman put his hand on the brake until the conductor signaled him to stop.

It appears that the motorman sounded the gong for some distance before the collision —the motorman says he sounded it continuously—but that deceased gave no evidence that he heard it, or that he was conscious of the car's approach. It was shown that the width of a street car track is a little over five feet, and that the width of the space between the two tracks where the accident occurred was four feet, two inches; that the car in question was eight feet wide, and overhung the track about eighteen inches. There was much testimony which would have justified a fact conclusion that the deceased was walking between the rails of the south track until just before the car reached him, when he suddenly turned and walked diagonally toward the north track, and reached it just in time to be struck by

the car, and this happened so quickly as to not give time to the motorman by the proper and diligent use of the means at his command to stop the car or otherwise prevent the collision.

On this state of the evidence the court charged the jury on the issue of discovered peril as follows: "Discovered peril would have existed in this case under the following conditions, and none other: If the deceased was seen by the operatives of the car, or either of them, to be in imminent peril of collision with the car, and it was realized by the operatives, or either of them, that he would not, or could not, save himself, but would certainly be injured unless they could prevent it, then a case of discovered peril had arisen, and it was the duty of the operatives of the car to do all that was practicable to avoid the injury, and for their failure to do so, if thereby the injury could have been avoided, the defendant would be liable, notwithstanding the deceased may have been guilty of contributory negligence." The correctness of this charge as applied to the evidence is assailed by appellants' first assignment of error. Upon this issue the appellants requested the court to give the following special charge: "If you find that the deceased was walking between the tracks of the company ahead of the car in question, and was walking so near the track as to be in danger of injury from the aproaching car, or that he was walking in such close proximity to the track on which the car was moving as to be in danger of injury from the car by reason of any slight change in his course which would throw him in the course of the car, and the motorman in charge thereof saw such danger, if any, and saw that deceased was unconscious of the near approach of the car, if he was, and saw this in time to have averted the threatened injury, if any, by the use of the means at hand, consistent with the safety of the car, and failed to do so, and by reason of such failure the car struck deceased and injured him so that he died therefrom, you will find for the plaintiffs, even though you may believe that the deceased was guilty of contributory negligence in failing to learn of the approach of the car and in failing to put himself in a place of safety." The refusal to give this charge is made the basis of appellants' fourth assignment of error.

By their first proposition under the first assignment appellants contend, in effect, that when the operatives of the street car discovered the deceased walking either in the actual course of the car, or so near the track upon which the car was proceeding as to render it reasonably probable that he would be struck by the car, unless it was stopped or his attention attracted, it became the duty of the motorman to use every means at hand consistent with the safety of the car to prevent the threatened collision;

and that it was not necessary, in order to call this duty into action, that it should be obvious to the motorman that the party in peril would certainly and inevitably be injured unless the duty was performed.

They assert by their second proposition that "it is error to charge the jury, upon the issue of discovered peril, that said issue cannot be found in favor of the plaintiffs unless it appeared from the evidence that the operatives of the car saw the deceased in imminent peril of collision with the car, and that it was realized by the operatives of the car that deceased would not or could not save himself, but would certainly be injured unless the operatives of the car could prevent it." If the testimony had shown that deceased was upon the track in the actual course of the car, and that, therefore, he would inevitably be injured unless the car was stopped, the charge of the court would have been correct as applied to that state of facts, at least it could not have operated to the prejudice of appellants. But that is not the case as made by the witnesses whose testimony is above quoted. No witness testified that the deceased was at any time in the actual course of the car. Those who testified as to his danger testified that it arose from his close proximity to the track. This is specially true as to the testimony of the witness Hamilton. He says he observed deceased while the car was a block distant from him and he was then walking between the two tracks, and continued to walk between the tracks until he was struck by the car. He was still between the two tracks and 25 or 30 feet in advance of the car when Bellar first saw him, and about 10 feet when Altenberger first saw him. The tracks are four feet and two inches apart, and the car extended eighteen inches over the rails, so that two cars, passing upon the tracks, would be only about one foot apart. A person of ordinary size, walking midway between the two tracks, would almost certainly be struck by a car passing on one of them, and this is true as to a person standing, even should the body be held rigidly erect and still. Neither Hamilton nor any other witness stated that deceased was walking nearer one track than the other, nor, indeed, that he was equidistant from both, but Hamilton says that, when he saw him walking between the tracks, he saw the car was going to strike him. The motorman says he sounded the gong continuously from the time he first saw the deceased until the car struck him. This witness places the deceased on the south track until just before the car reached him, at which time he says the deceased suddenly turned and walked to the track upon which the car was proceeding, and was struck before the motorman had time to stop or greatly lessen the speed of the car. It must have been apparent to the motorman that the sound of the gong had not attracted deceased's attention, and, if Hamilton spoke the truth, that deceased was wholly unconscious of the car's approach. In the light of these facts, and especially of the testimony of Hamilton, Bellar, and Altenberger, could the motorman speculate on whether the car would in fact strike the deceased or miss striking him by the narrow margin of a few inches? When, if Hamilton testified truly, the proximity of deceased to the track was such as to excite in his mind an apprehension that the deceased would surely be struck if he continued walking as he was, and when it was apparent that he did not hear the ringing of the gong, could the motorman delay action until such time as he realized that the deceased would certainly be injured unless he prevented it? We think not. To hold that the motorman could proceed as long as it might appear to him that he could miss by a few inches a man apparently unconscious of danger, provided the man kept his exact course, and that he was not called upon to act until he realized that the person so exposed would certainly be injured unless the use was made with the means at hand to prevent it, would be to permit the motorman in a large measure to speculate upon human life and limb, and would tend to the annulment of the humane theory upon which the doctrine of discovered peril is rested. Railway v. Finn, 107 S. W. 94; Id., 101 Tex. 511, 109 S. W. 918; Sanchez v. Railway, 88 Tex. 118, 30 S. W. 431; Brown v. Griffin, 71 Tex. 654, 9 S. W. 546; Railway v. Ploeger, 93 S. W. 226; Id. (Sup.) 93 S. W. 722; Railway v. Munn, 46 Tex. Civ. App. 276, 102 S. W. 442; Railway v. Jacobson, 28 Tex. Civ. App. 150, 66 S. W. 1111; Railway v. Hanna, 34 Tex. Civ. App. 608, 79 S. W. 639. It is the knowledge by the operatives of the danger of injury, and not the certainty of injury, that calls forth the action. It is sufficient if the peril be discovered in such time that by the proper use of the agencies at hand the injury can be avoided. McDonald v. Railway, 86 Tex. 14, 22 S. W. 939, 40 Am. St. Rep. 803; Railway v. Lively, 14 Tex. Civ. App. 554, 38 S. W. 372; Railway v. Haltom, 95 Tex. 115, 65 S. W. 625; 29 Cyc. 531.

We think the court should not have given the charge complained of, but should have charged the jury in substantially the language of the requested charge. The assignments raising the points are sustained.

We have examined the other assignments presented in appellant's brief, and think that there are no reversible errors pointed out in any of them. For the errors indicated, the judgment of the court below is reversed and the cause remanded.

Reversed and remanded.

### On Motion for Rehearing.

We have carefully considered appellee's motion for rehearing, and are of the opinion that it should be overruled, and it has been so ordered.

In the opinion heretofore filed in this case

we say: "If the testimony had shown that deceased was upon the track in the actual course of the car, and that therefore he would inevitably be injured unless the car was stopped, the charge of the court would have been correct as applied to that state of facts, at least it could not have operated to the prejudice of appellants." This much of the opinion we now withdraw. We do this because the language quoted, standing alone, is not strictly accurate and is probably misleading. It would not in any instance appear that a person, even walking between the rails of a track, ahead of a moving car, would certainly and inevitably be injured, if the car was not stopped, if it also appeared that he was in control of his powers of locomotion. Such certainty of injury could only become obvious where it was apparent that the person so exposed could not leave the track, as, for instance, that he was down and helpless, either between the rails or so near the track as to be in the actual course of the car. One having his power of locomotion has always the chance of saving himself at the last instant, and it will not do to say that a motorman in charge of a moving car, seeing a person walking in the course of the car, with his back to it, apparently oblivious of its approach, may speculate upon the possibility that the person will hear the noise of the car or the gong and save himself at the last instant. As stated in the main opinion, it is the knowledge of the danger, and not the certainty of the injury, that calls forth the action of the operatives to use all the means at hand, consistent with the safety of the car, to stop.

Overruled.